IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA                                          PLAINTIFF

v.

No.6:06CR60001-001

VIRGIL E. BUTLER                                                      DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

The defendant, Virgil E. Butler (hereinafter "Defendant"), is charged in an indictment

filed herein on November 11, 2005, with being a felon in possession of a firearm in violation of

*18 U.S.C. §§ 922(g)(1) & 924(a)(2)*, and possession of an unregistered firearm in violation of *26*

*U.S.C. § § 5841, 5861(d) & 5871*. (Doc. #1)

Pending before the Court is the defendant's motion to suppress filed on April 14, 2006.

(Doc. #27)   The United States filed a response to the motion on April 24, 2006. (Doc. #29)

Hearing on the motion was conducted on May 9, 2006.  The United States appeared by Assistant

United States Attorney, Charles Smith.  The Defendant appeared in person and by his attorney,

Assistant Federal Defender Lisa Peters.  A supplemental hearing was conducted on June 13,

2006.  The United States appeared by Assistant United States Attorney Matt Fleming and the

Defendant appeared in person and by his attorney, Assistant Federal Defender Lisa Peters.

Following the hearing, the undersigned took the motion under advisement.

In the pending motion the defendant seeks suppression of items found by law enforcement

officers, on April 29, 2005, in a rural Montgomery County, Arkansas residence which was

occupied by the defendant and his companion and suppression of statements made by the

defendant to law enforcement officers after he was taken into custody.

**Evidence presented:**

_____**Stipulations:** The parties stipulated that on December 3, 2001, in *State of Arkansas v. Laura Alexander*, Polk County Circuit Court, Criminal Division, No. CR-2000-138, an order of probation was entered, placing Laura Alexander on probation for the term of 48 months, after pleading guilty to the offense of Possession of a Schedule II Controlled Substance in violation of *Arkansas Code Annotated § 5-64-401*.   Among the conditions of probation is condition number nine, requiring the probationer to:

> 9.  Submit your person, property, place of residence or vehicle to search and seizure at any time of the day or night, with or without a search warrant, whenever requested to do so by the probation officer. **Government Ex. #1**

It was further stipulated that by order of the Circuit Court of Polk County, Arkansas, Criminal Division, in *State of Arkansas v. Laura Alexander*, No. Cr-00-138, dated January 9, 2004, Alexander's probation was changed to unsupervised status with the requirement that she comply with all probation conditions in the original order but she would not be required to report or pay a probation fee.  **Government Ex. #2**

Finally, the parties stipulated, in open court, that on April 29, 2005, the defendant resided in the subject residence along with Alexander.

**Testimony:**

**Frank Gibson:** Frank Gibson testified that he is a probation officer with the Arkansas Department of Community Correction in Arkansas' 18th West Judicial District which is composed of Polk and Montgomery counties.  He has been so employed for just over two and one-half years. He works out of Mena, Arkansas.  Gibson has a bachelor's degree from Arkansas Tech University and attended the six week probation officer's academy.  Gibson supervises probationers in Polk, Montgomery and Scott Counties.

AO72A
(Rev. 8/82)

Among the basic conditions of probation is the requirement that the probationer refrain from using or possessing controlled substances. Each probationer is apprised of the conditions of probation at the time that supervision begins.

Gibson stated that Vickie Fenwick is a fellow probation officer in his office and that they are of equal rank. Officer Fenwick supervised a probationer by the name of Laura Alexander. Gibson was not monitoring her directly. Alexander's underlying charge was possession of controlled substance, methamphetamine, in Polk County. Her probation began on December 3, 2001. The probation officers in Gibson's office substitute for each other.

Gibson has no knowledge as to whether or not Alexander had violated any of the terms of her probation prior to April 29, 2005. Prior to April 29, 2005, Alexander's probation had not been revoked.

On April 29, 2005, Gibson received a telephone call from Prosecutor Tim Williamson regarding Alexander. Williamson stated that there was possibly a marijuana patch grown by an occupant of the Alexander residence as well as guns inside the house which would be clear violations of her probation conditions. Gibson called Probation Officer Fenwick but she was on vacation. Gibson believes that Officer Fenwick had also spoken with Prosecutor Williamson. Probation Officer Fenwick advised Gibson to do a search of the Alexander home in Fenwick's absence. Gibson received directions to Alexander's home from Williamson.

Gibson believes that he telephoned the Drug Task Force that day. Gibson keeps notes regarding his case activity. He made computer entries that day. These notes state that Gibson called the prosecutor to get directions to the Alexander residence.

Gibson wanted to do a probation search because there was a marijuana patch near the Alexander residence and there were possibly guns inside her residence. The information created

-3-

a reasonable suspicion that there had been probation violations.

Gibson then made contact with Detective Mike May with the 18th West Judicial District Drug Task Force. This task force covers Polk and Montgomery County. Gibson asked that officers come with him. This is not documented in Gibson's case paper work. Gibson stated that, although he is entitled to conduct a search, he goes with police officers for his safety and to have assistance in conducting the search. He asked Detective May to come with him because Gibson was by himself and to assist in the search. Further, May knew the area. Gibson did not normally work Montgomery County. Gibson rode with Deputy Campora because he had not been to the Alexander residence before. The Alexander residence was in Oden, Arkansas.

Gibson and Officer Campora arrived at the Alexander residence first. The other officers were behind them in their vehicles. Alexander was outside. Gibson identified himself and told Alexander that he needed to do a search of Alexander's residence for Officer Fenwick to see if Alexander was in violation of her conditions. Gibson asked Alexander who else was in the residence and she replied that the defendant, Virgil Butler, was there. Gibson and Officer Campora followed Alexander into the residence. The other officers were still outside. Inside the residence, Gibson saw a foot partially hidden by cabinetry and he ordered the subject to show his hands and come outside. It was the defendant. The defendant complied the second time Gibson commanded him to do so. Gibson asked the defendant his name and the defendant replied, "You've got me." The defendant was escorted out of the residence by Officer May and some other officer. Gibson stayed inside.

The defendant seemed quite coherent. He did not want to talk with Gibson.

Prior to going to the residence Gibson had never met the defendant before and knew nothing about him. The officers had stated that the defendant had a violent background and that

-4-

there was a body attachment warrant for his arrest. The defendant was behind on child support.

Gibson participated in the search of the residence. It was his understanding that the defendant lived there also. Gibson found: a syringe in the cabinetry beside the bed, a .22 caliber bullet, and a gun holster. Gibson did not see nor did he seize any firearms. As Gibson was beginning to search the kitchen cabinet he found some bottles of pills. Detective May then entered the residence. The other officers searched other areas of the residence.

Gibson has had training in the area of methamphetamine usage and approximately 75 per cent of his case load are individuals who used methamphetamine, approximately 90 people. He has seen syringes before. Methamphetamine is melted down using heat and then injected into the veins using a syringe.

Gibson testified that he does not recall telling counsel for the defendant that officers wanted to do a probation search of the Alexander residence.

According to Gibson, arrests are normally made on body attachment warrants and Gibson has made such arrests at least 10 times in the past. Gibson has actually served over 100 warrants.

The Alexander residence was approximately 75 yards from the main highway and the marijuana patch was approximately 25 yards on the other side of the main highway.

**Mike May:** Mike May is a senior investigator for the 19th West Drug Task Force. This task force covers Polk and Montgomery counties. May mostly handles Montgomery County. His supervisor is Prosecutor Tim Williamson. May has been a police officer for ten years and he has had 700 hours of training in drug cases.

May identified the defendant, Virgil Butler, in the court room. May encountered the defendant on April 29, 2005.

On April 29, 2005, May was notified by Deputy Campora that a small marijuana growing

-5-

operation had been found by the power company. May went with Forest Service Law Enforcement Officer Tim Fincham and Deputy Campora to the plot. They then returned to the prosecutor's office.

Prosecutor Williamson decided to contact Probation Officer Vickie Fenwick because the address right across from the grow operation came back to Virgil and Laura Alexander and Alexander was on probation at the time. May had not met Alexander before April 29, 2005.

Probation Officer Frank Gibson contacted May after Officer Fenwick had contacted him. May received a phone call from Gibson instructing him to meet Gibson at Pine Ridge. May remembers only one telephone call that day from Gibson.

May, Gibson and Deputy Campora met at Pine Ridge and they proceeded to the residence. Gibson requested that the officers go with him to do a probation search. Upon arrival at the residence Gibson talked to Alexander. They entered the residence and the defendant came out. May advised Butler that he had a body attachment for him and he placed the defendant under arrest. Arkansas Game and Fish Officer Russ Carmack advised the defendant of his *Miranda* rights and then May talked to the defendant. The defendant was verbally *Mirandized*. May saw and heard this.

May carries documents with which a person can say he has been *Mirandized* but he left his copies in another vehicle. May does not know if the other officers at the scene had such documents. May did not ask anyone if they had a *Miranda* rights form available.

After the defendant was questioned he was mostly concerned about Ms. Alexander. He said that she did not have anything to do with the grow operation across the road and that he did not want her in trouble for it. The defendant was responsive to May's questions. He appeared competent. May has no information about the defendant's mental health.

-6-

May has assisted probation officers in searches numerous times before. He was there for officer safety and to cover the area. May participated at the end of the search after a shotgun and other things were located. May believes that Gibson and Deputy Campora searched while May and Officers Carmack and Fincham were outside with the defendant. During the search the following items were found: a tin container containing ten syringes, some rolling papers, hemostats, a small pair of trimming scissors, a sawed off .12 gauge Mossburg that had been partially disassembled, a Harrington-Richardson rifle of undetermined caliber, a small plastic container containing 363 marijuana seeds. The sawed off shotgun was found under the mattress of the bed in the front of the trailer. Tools were also seized to show garden cultivation. The items found were seized and are held in evidence pending trial of this case.

The residence was 75 yards from a paved highway. The marijuana patch was located on the other side of the highway and 25 yards from it. May, the defendant and one of the other officers went across the road and looked at the patch. The defendant admitted that the patch was his and he stated that he had a small grow operation. The nearest source of water was the Alexander residence. There was a faint path leading from the residence to the patch. There were four small plants in the patch. They were seized and forwarded to the Arkansas State Crime Lab where they tested positive for the presence of marijuana.

The defendant was taken by Deputy Campora to the Montgomery County Sheriff's Office. He was interviewed there. That interview was taped. He was re-*Mirandized*. May read the *Miranda* rights to the defendant. He signed a written form. He was questioned for approximately 45 minutes. He appeared responsive to questions. He answered directly. He did not hesitate or have problems giving legitimate responses to the questions. The transcript of the interview of the defendant, which was conducted by May, reveals that the defendant stated that

-7-

he was taking Valium prescribed for him. Further, in the transcript, May states: "You are under psychiatric care at this time, you were telling me."

During the interview, the defendant told of being involved in an exchange of gun fire at the 22 Lounge in Paris, Arkansas in which the defendant shot and killed a person. May talked to a gentlemen who had been sheriff at the time and he did not recall a homicide. During the interview, May asked the defendant about various persons of interest in on-going drug investigations, such as Charles Elliott, Tony Thacker and Buddy Ayers. The defendant's answers were responsive to the questions and the information was corroborated by previous intelligence.

April 29th was the first time May had encountered the defendant. As part of his routine, prior to going to the residence, May ran an NCIC check of the defendant. He found convictions for terroristic threatening and an aggravated assault as well as a body attachment in the amount of $750.00. This raised the issue of officer safety.

The Alexander-Butler residence is located in a rural area and consisted of a small trailer with one common room like a camper trailer along with two other sheds. The sheds contained lumber, chicken wire and other farm stuff. The sheds were searched. The next residence is a quarter of a mile away.

May believed that officers possessed enough information to secure a search warrant.

**Laura L. Alexander:** Laura L. Alexander testified that prior to leaving her house, before testifying at the suppression hearing, she took valium, a methadone, a soma and an analor. She stated that she is a chronic pain patient and has been on that kind of medication for a number of years.

She lived with the defendant on April 29, 2005. Alexander was on probation for possession of her own prescription of methadone. She was on probation for four years. She had

no violations of probation, passed every drug test, paid every fine and did everything she was supposed to do.

She has lived with the defendant for approximately five years. She was drawn to the defendant due to his mental health condition. She got the defendant to see a psychiatrist and he was seeing a psychiatrist in April of 2005. He either began seeing the psychiatrist during the Christmas and New Years Holidays prior to April, 2005, or a year before that. Alexander's mother is a healing touch practitioner who worked with the defendant.

The defendant suffers from Post Traumatic Stress Disorder. Alexander is also seeing a psychiatrist for Post Traumatic Stress Disorder.

The defendant has arthritis in his back, hip and knee. He cut his right knee with a chain saw. He has high blood pressure. Alexander cannot confirm all of these conditions because the defendant has no medical insurance. The defendant has flashbacks with the PTSD. He "will go out of the world" and she has to "talk him back."

Alexander stated that she had no idea that the defendant was growing marijuana across the road. On April 29, 2005, she knew that the defendant was a convicted felon.

**Discussion:**

The defendant asks that (1) the items found during the search by law enforcement officers of the residence of the defendant and Alexander conducted on April 29, 2005, be suppressed; and, (2) that any statements made by the defendant to law enforcement officers after he was taken into custody, be suppressed.

Search: With respect to the search of the residence, the defendant asserts that no officer had the authority to enter the dwelling; that Probation Officer Gibson was outside of his geographical jurisdiction; and, that the alleged "probation search" of the dwelling was in actuality

-9-

a "ruse" in aid of a police investigation.

Arkansas Probation Officer Frank Gibson testified that he works in Arkansas' 18th West Judicial District, which covers Polk and Montgomery Counties. He stated, without contradiction, that he supervises probationers in Montgomery County. The Butler-Alexander residence and property was located at Oden, Arkansas, which is located in Montgomery County. Accordingly, the probation officer was operating within the geographical territory of his district at the time of the search.

The defendant also contends that the search of the residence was unreasonable under the Fourth Amendment. In this regard, the defendant argues that Probation Officer Gibson did not have reasonable suspicion that probationer Alexander was engaged in criminal activity, and, that the search was performed solely to help law enforcement officers evade the requirements of the Fourth Amendment. This assertion has been referred to as the "stalking horse" theory. *See United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997)("a parole search is unlawful when it is nothing more than a ruse for a police investigation."); see *also United States v. Scott*, 945 F.Supp. 205 (D.S.D. 1996)(using the term "stalking horse"). This theory was rejected by the Supreme Court in *United States v. Knights*, 483, U.S. 868 (1987), where the court concluded that a probationary search pursuant to a condition of probation is to be subjected to the Fourth Amendment reasonableness balancing test and that no inquiry as to "official purpose" is required. *See Knights*, 534 U.S. at 122; *see also United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003)("... the *Knights* case teaches that traditional Fourth Amendment analysis-not official purpose-determines whether a probationary search is constitutional.").

Here, the order placing Alexander on probation in 2001 contains the explicit condition that she must "submit [her]...property, place of residence ... to search and seizure at any time day

-10-

or night, with or without a search warrant, whenever requested by the probation officer."
**Government Ex. #1** Although Alexander's probation was reduced to unsupervised status in 2004, the order specifically required that Alexander "...comply with all probation conditions in the original Order..." **Government Ex. #2** Thus, on the day in question, Alexander, who resided with the defendant in the Oden residence, was subject to a search condition.

In such circumstance, "the traditional Fourth Amendment balancing test" is to be used "to determine the search's constitutionality." *Id.* Under this frame work:

> ...when a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms...

*Id.* In addition to a search condition, Alexander was also subject to conditions of probation which prohibited her from committing an "offense punishable by imprisonment," or from "using or possessing any scheduled controlled substance unless prescribed" by a physician. **Government Ex. #1** Prosecutor Williamson reported to Probation Officer Gibson and Alexander's supervising probation officer, Vicky Fenwick, that a marijuana patch had been discovered by power company personnel approximately 100 yards from Alexander's rural Montgomery County residence.

Drug Task Force Agent May testified that he had been advised by Deputy Campora that a small marijuana "grow operation" had been found. May went with a Forest Service Ranger and Deputy Campora to the location of the plot. May then reported the situation to the prosecutor.

Although Gibson testified that Williamson also reported that weapons might be present in the residence, this seems to be of secondary importance, and, indeed, no evidence was presented as to why law enforcement officers reached such a conclusion. We conclude that the

-11-

report to the probation officers, by the prosecutor, of the existence of a marijuana patch near Alexander's home, alone created "reasonable suspicion" that Alexander was violating terms of probation. Gibson was asked to conduct the search by Alexander's supervising probation officer, Officer Fenwick. Accordingly, Gibson was constitutionally permitted to search the residence. *Id.* at 810 (probation officer had reasonable suspicion that probationer was violating his probation terms where probationer was advised, by a drug task force agent, that the probationer's drug involvement was being investigated)

Having constitutional authority to conduct the search, Gibson was also permitted to enlist the aid of law enforcement officers in accomplishing that task. Gibson testified that he asked officers to accompany him out of concern for his safety. This explanation is corroborated by the fact that: prior to the search he was told that the defendant had a violent background and was behind on child support payments, Gibson was not familiar with the area of Montgomery County in question, Gibson clearly directed the officers in assisting him, he arrived at the residence first and entered the residence first, and, he and the officers searched different areas of the residence. As stated in *Brown*:

> Under *Knights*, we must balance any additional privacy intrusion resulting from the presence of the additional personnel against the legitimate interests advanced by their presence...Probation offices are neither designed nor staffed to conduct these types of searches alone. *See Reyes*, 283 F.3d at 469 (The "'assistance of other law enforcement officers for protection ... and for taking possession of contraband is appropriate and recommended.'")(quoting David N. Adair, Jr., *Probation Officer Searches*, 62 Fed. Probation 68 (June 1998)). Probation officers often must bring law enforcement along to ensure the probation officer's safety. *See id.* We hold the governmental interest in ensuring probation officer safety outweighs any marginal, additional intrusion into Brown's privacy resulting from the task force agents' presence. In short, when a probationary condition authorizes searches by probation officers, the Fourth Amendment does not require probation officers to choose between endangering themselves by searching alone and foregoing the search because they lacked the resources and expertise necessary to search alone safely. Thus, the *Knights* balance does not

-12-

AO72A
(Rev. 8/82)

change and the government can prevail if [the probation officer] had a reasonable suspicion that Brown was violating the terms of his probation.

*Id.* at 812.

We therefore conclude that the participation of other law enforcement officers in the search was constitutionally permissible. Accordingly, the evidence discovered in the residence need not be suppressed.

Statements: According to the testimony of Agent May, the defendant was taken into custody as he exited the residence based on the outstanding body attachment. According to the officer, Arkansas Game and Fish Officer Russ Carmack then advised the defendant of his *Miranda* rights. The defendant then spoke with the officers admitting that the marijuana patch found across the road was his. The defendant was then taken by officers to the Montgomery County Sheriff's Office where May questioned him after again advising the defendant of his *Miranda* rights.[1]

"[T]he Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during 'custodial interrogation' without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). *Miranda* provides that the accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has a right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. at 478-79. A waiver of the privilege is valid only if it is made voluntarily, knowingly, and

---

[1] With regard to the statements made, both at the residence and at the Sheriff's Office, the defendant does not contend that valid *Miranda* warnings were not given. Instead, the defendant asserts that he did not have the mental competence to knowingly and intelligently waive his privilege against self incrimination or his right to counsel.

intelligently. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right, and a waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

The defendant contends that he suffered from mental illness which prevented him from knowingly and voluntarily choosing to speak to the officers. However, the only evidence to this effect is the testimony of the defendant's friend and fellow resident, Laura Alexander. She testified that the defendant was under psychiatric care and suffered from Post Traumatic Stress Disorder and the effects of physical and sexual abuse as a child. It is found that Alexander's credibility is diminished by her admission that she had taken a potent combination of prescription, narcotic medications prior to testifying at the suppression hearing.[2] Further,

---

[2]Valium is indicated for the mnanagement of anxiety disorders for the short-term relief of the symptoms of anxiety. Anxiety or tension associated with the stress of everyday life usually does not require treatment with an anxiolytic. ...Side effects most commonly reported are drowsiness, fatigue and ataxia, infrequently encountered were confusion, constipation, depression, diplopia, dysarthria, headache, hypotension, incontinence, jaundice, changes in libido, nausea, changes in salivation, skin rash, slurred speech, tremor, urinary retention, vertigo and blurred vision. *Physicians' Desk Reference (hereinafter "PDR"), p. 2822 (60th Ed.2006).*

Soma (carisprodol), is a muscle relaxant mediation that affects the communication between the brain and the spinal cord (central nervous system). It acts as a sedative, which most likely causes its muscle-relaxing effect. It is recommended only for initial, short-term treatment of neck pain. Side effects include possible addiction or dependence, drowsiness, dry mouth and urinary retention. See *www.webmd.com.*

Methadone acts on specific receptors in the brain and spinal cord to decrease the feeling of pain and to reduce the emotional response to pain. The action of methadone is similar to other synthetic (man-made), medications in the morphine category (opioids). Substances that are derived directly from the opium plant (such as heroin, morphine and codeine), are known as opiates. Methadone is used

-14-

although Alexander described the defendant as suffering from certain mental conditions, she gave no testimony indicating that the defendant, on April 29, 2005, was incapable of voluntarily, knowingly and intelligently waiving his privilege against self incrimination by making statements to the officers.

Agent May also acknowledged that the defendant told him, during the questioning at the Sheriff's Office, that he was receiving psychiatric treatment and that he was taking valium, however, Probation Officer Gibson and May testified that the defendant appeared competent. May testified that the defendant was responsive to questions, answered directly and did not hesitate or have difficulty in responding. Further, according to May, the defendant gave information as to individuals which was corroborated by other independent investigation. No expert or other disinterested testimony was presented to the court with respect to this issue.

The defendant points to his assertion, during interrogation, that he had committed a homicide in Paris, Arkansas, years earlier, as indicative of a delusional state. Although May could not confirm this statement through a former Sheriff in Paris, the record is simply silent as to whether or not the incident referred to by the defendant actually occurred.

From the foregoing, it is found that the defendant voluntarily, knowingly and intelligently waived his privilege against self-incrimination by making statements after he was advised of his *Miranda* rights.

We conclude, therefore, that the defendant's motion to suppress with respect to his

---

to control cancer pain or chronic pain not caused by cancer when other opioids, such as morphine, have not been effective. Side effects include drowsiness, lightheadedness, weakness and fatigue, euphoria, dry moth, difficulty urinating and breathing, constipation and skin reactions. See *www.webmd.com.*

Analor is used to treat both tension and migraine headaches. Common side effects include: stomach or intestinal irritation; involuntary quivering; fast heartbeat; drowsiness; and, dizziness; voluntary movement difficulty. Infrequent side effects include: depression; confusion; and, over excitement. See *www.webmd.com.*

AO72A
(Rev. 8/82)

statements made while in custody must be denied.

**Conclusion:**

Accordingly, for the reasons set forth above, we recommend that the motion to suppress be denied in its entirety.

**The parties eight (8) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

DATED this 6th day of July 2006.

/s/ *Bobby E. Shepherd*
HON. BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)